E. MARTIN ESTRADA
United States Attorney
CAMERON L. SCHROEDER
Assistant United States Attorney
Chief, National Security Division
KATHRYNNE N. SEIDEN (Cal. Bar No. 310902)
Assistant United States Attorney
Terrorism and Export Crimes Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0631
    Facsimile: (213) 894-0141
    Email:    kathrynne.seiden@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 2:23-79-MEMF |
|---|---|
| Plaintiff, | **GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT ISAAC AARON MORGAN LOFTUS** |
| v. | |
| ISAAC AARON MORGAN LOFTUS, | Hearing Date: January 3, 2023 |
| Defendant. | Hearing Time: 9:00 a.m.<br>Location:    Courtroom of the Hon. Maame Ewusi-Mensah Frimpong |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Kathrynne N. Seiden, hereby files its Sentencing Position for defendant Isaac Aaron Morgan Loftus.

    This Sentencing Position is based upon the attached memorandum of points and authorities, the files and records in this case, and

//

//

such further evidence and argument as the Court may permit.  The government respectfully requests the right to supplement this Sentencing Position with additional information as needed, including to respond to defendant's Sentencing Position.

Dated: December 20, 2023          Respectfully submitted,

                                  E. MARTIN ESTRADA
                                  United States Attorney

                                  CAMERON L. SCHROEDER
                                  Assistant United States Attorney
                                  Chief, National Security Division


                                          /s/
                                  _____
                                  KATHRYNNE N. SEIDEN
                                  Assistant United States Attorney

                                  Attorneys for Plaintiff
                                  UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

On multiple occasions since 2016, defendant Isaac Loftus ("defendant") has been banned from possessing firearms based on his mental health.  Nonetheless, at some point leading up to November 2022, defendant amassed a significant number of illegal firearms and firearm-related items, including several dozen 3D-printed machineguns, multiple ghost guns, a short-barreled rifle, a firearm assembly kit, a 3D-printer, dozens of magazines, and a silencer, among other items.  In November 2022, defendant was arrested in public wearing a tactical vest and armed with multiple knives, heavy duty zip ties, and a loaded ghost gun he was reportedly pointing at civilians.  In August 2023, defendant pled guilty to possession of machineguns, in violation of 18 U.S.C. § 922(o)(1).  (Dkt. 25, Presentence Investigation Report ("PSR") ¶¶ 1-2.)

Probation correctly calculated defendant's total offense level as 17 and his criminal history category as I, for a Guidelines range of 24 to 30 months' imprisonment.  (Id. ¶ 98.)  The government agrees with Probation's calculations.

Undoubtedly, defendant suffers from significant mental health issues which are at least partially mitigating considerations for sentencing.  However, defendant's mental condition also underscores the dangerousness of his criminal conduct in this case -- stockpiling illegal weapons -- given that it resulted in defendant pointing a loaded weapon at civilians while suffering a mental health episode.  Thus, the Court is faced with the difficult task of balancing the need to protect the public with the need to provide defendant with necessary medical care and correctional treatment in an effective

manner, among other concerns.  The government submits that a low-end 24-month sentence and the maximum three years' supervised release, including the the stringent conditions of supervised release recommended by probation, is sufficient but not greater than necessary to account for the considerations enumerated in 18 U.S.C. § 3553(a).

## II. FACTUAL BACKGROUND

Defendant has been placed on at least four psychiatric holds, which have resulted in a lifetime prohibition from owning firearms. (PSR ¶¶ 11, 68.)  Nonetheless, between January 13, 2020, and July 30, 2021, using eBay and Amazon accounts linked to an email address titled "deathbeforedishonor," defendant purchased numerous firearms parts and accessories, including trigger modifiers, spring cups, extended magazine releases, a compensator, rifle scopes, magazine pull assists, magazines, a recoil, an ankle holster, a magazine holster, and other items.  (Id. ¶ 12.)

Defendant also obtained numerous firearms.  For example, on November 21, 2022, after stealing a Honda from a car dealership, defendant placed in the Honda a toolbox containing a suppressor, a short-barreled AR-15 style rifle without a serial number, 23 magazines (including high-capacity magazines), various calibers of ammunition, firearm accessories and parts, and a 3D-printed machinegun conversion device.  (Id. ¶¶ 13, 16.)  Defendant also placed in the Honda a loaded 9mm ghost gun.  (Id.)  The next day, November 22, 2022, defendant crashed the stolen Honda and abandoned the car.  (Id.)

Later in the day on November 22, defendant was observed holding a gun in the vicinity of a high school in South Los Angeles.  (Id.

¶ 14.)  A witness reported that defendant was pointing the firearm at two moving vehicles with occupants.  (Id.)  Law enforcement confronted defendant, who was wearing a tactical vest and carrying a second loaded 9mm ghost gun in a holster, multiple knives, and heavy-duty zip ties.  (Id.)  Defendant told law enforcement that they would be "dead" if they continued to question him, that it was "judgment day," and referred to himself as "Yahweh" (Hebrew for God).  (Id. ¶¶ 14, 24; Dkt. 1 at ¶ 13.)  Later, while sitting outside of the jail dispensary, defendant spontaneously stated that "judgment day ha[d] been delayed." (PSR ¶ 25.)

    Law enforcement later found the stolen Honda containing the other loaded 9mm ghost gun, the short-barreled rifle, the silencer, and other items.  In a room defendant rented in Pasadena, law enforcement found a Polymer 80 kit, an AR-15 style magazine, live ammunition, two plastic lower frames of ghost guns, and an additional 56 3D-printed machinegun conversion devices.  (Id. ¶ 17.)  When interviewed, defendant's mother reported that defendant had purchased weapon parts online and downloaded files for 3D printing gun parts and that he knew he was not permitted to have firearms.  (Id. ¶ 20.) Defendant's mother also indicated that defendant had made comments about the world ending and had expressed that if he were to "go out," it would be "death by cop."  (Id.)

    Evidence found in defendant's room, on his person, and in his online activity suggests that defendant subscribed to the Boogaloo ideology: an anti-government extremist movement whose adherents believe there will be a civil war or uprising against the United States government following perceived incursions on constitutional rights.  (Id. ¶ 12 & n. 1.)  For example, when arrested on November

3

22, defendant held his loaded 9mm ghost gun in a holster bearing an Igloo and two stripes of Hawaiian styled flowering, both symbols associated with the Boogaloo movement. (Id. ¶ 15 & n. 2.) A large Boogaloo-style flag covered the bed in defendant's bedroom, where law enforcement also found Hawaiian-style shirts and various patches bearing insignia and mottos associated with the Boogaloo movement, including "Three Percenter[1]" and "Liberty or Death." (Id. ¶ 18.) Several of defendant's online purchases also reflect Boogaloo ideology, including, for example, a t-shirt defendant purchased with the description "Funny Fuck Around Big Igloo Boogaloo 3per 3% veteran gift t-shirt." (Id. ¶ 12.)

### III. PROBATION'S GUIDELINES CALCULATIONS AND RECOMMENDATION

Based on the facts above, Probation determined: (1) defendant's base offense level is 18, based on defendant having possessed a firearm described in 26 U.S.C. § 5845(a); (2) a two-level increase is warranted, based on defendant's possession of three to seven firearms; and (3) defendant is entitled to a three-level decrease for timely acceptance of responsibility. (PSR ¶¶ 30-44.) Accordingly, Probation calculated defendant's total offense level as 17. (Id. ¶ 45.) Probation also determined that defendant has zero history points, resulting in a criminal history category of I. (Id. ¶ 50.) Based on a total offense level of 17 and a criminal history category of I, Probation calculated defendant's Guidelines range as 34 to 30 months' imprisonment and one to three years' supervised release. (Id. ¶¶ 98, 101.) Probation also analyzed data from the United

---

[1] The three percenters are a sub-ideology of the larger antigovernment militia movement, who espouse a belief that a small force of armged individuals can overthrow a tyrannical government. (PSR ¶ 12 & n. 1.)

4

States Sentencing Commission, which reflects that during the last five fiscal years, 788 defendants with a total offense level of 17 and a criminal history category of I were sentenced under U.S.S.G. § 2K2.1.  (Id. ¶113.)  84% of those descendants received a sentence of imprisonment, at an average of 21 months and a median of 24 months. (Id.)

Although Probation acknowledged that a defendant's mental and emotional conditions may be relevant in determining whether a departure is warranted under U.S.S.G. § 5H1.3, (id. ¶117), Probation did not recommend such a departure.  (Dkt. 24, Recommendation Letter at 6.)  Instead, given the "aggravating offense circumstances that were not captured by the Guidelines range," including the number of machineguns defendant possessed which were excluded from the Guidelines definition of "firearms" and the fact that defendant was wearing tactical gear and pointing a loaded firearm at motorists in the middle of the day near a high school, Probation recommended a high-end Guidelines sentence of 30 months' imprisonment and three years' supervised release.  (Id. at 5-6.)

Probation also recommended several stringent conditions of supervised release, including that defendant submit to suspicion-less searches (which defendant also agreed to as part of his plea agreement) and that defendant participate in drug testing, outpatient drug treatment, and "participate in mental health treatment, which may include evaluation and counseling, until discharged from the treatment by the treatment provider, with the Probation Officer's approval."  (Id. at 2-3.)  Finally, Probation recommended that defendant's online activity be monitored and that defendant "not associate with anyone known to the defendant to be a member of the

Boogaloos or the Three Percenters groups" or "be present in any area known to [] be a location where members of the Boogaloos or the Three Percenters groups meet or assemble." (Id. at 4.)

### IV. 24 MONTHS' IMPRISONMENT AND 3 YEARS' SUPERVISED RELEASE IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO ACCOUNT FOR THE § 3553(A) FACTORS

The government respectfully requests that the Court adopt Probation's factual findings and Guidelines calculations and sentence defendant to a low-end Guidelines sentence of 24 months' imprisonment, three years' supervised release, and a $100 special assessment.

### A. Nature and Circumstances of the Offense and History and Characteristics of Defendant

Defendant's conduct in this case was serious. Defendant broke into a car dealership, stole a car, and armed it with magazines, ammunition, and several illegal firearms, including a loaded ghost gun and a short-barreled rifle. (PSR ¶¶ 13, 16.) He then crashed it, abandoned it, and stood outside a high school dressed in tactical gear and armed with multiple knives, pointing yet another loaded firearm at passing motorists and evading police when approached. (Id. ¶¶ 13-14.) In defendant's home, he kept more than four dozen 3D-printed machineguns, firearm parts, a kit for assembling firearms, ammunition, and other firearm accessories. (Id. ¶ 17.) In other words, defendant's crime was dangerous. That dangerousness is underscored by defendant's comments to his family about going out by "death by cop", his comments to law enforcement about "judgment day" when he was arrested, and his commitment to an ideology that condones the use of force against the government. (Id. ¶¶ 12, 14, 18, 20, 25.) Fortunately, nobody was hurt in this instance. But defendant's

sentence should reflect the dangerousness of his crime and the need to protect the public.  See 18 U.S.C. § 3553(a)(1).

As Probation pointed out, defendant's Guidelines do not account for much of the conduct described above, including that he broke into a dealership and stole a car; abandoned a hit-and-run; carried a loaded gun in public and pointed it at motorists; 3D-printed firearms; or possessed more than 50 machinegun conversion devices. (Recommendation Letter at 5.)  Given that defendant is facing the same sentence as would, for example, someone whose only crime was possessing three conversion devices stored safely in a home, a within-Guidelines sentence is warranted.

To be sure, defendant appears to suffer from mental health conditions that are somewhat mitigating.  For example, the fact that defendant seems to have been suffering from severe delusions at the time of his arrest provides necessary context in assessing his intentions when he stood outside a high school pointing a loaded gun at motorists.  (PSR ¶ 74.)  But as evidenced by what happened here, defendant's mental health issues also exacerbate the dangerousness of his decision to collect and produce illegal firearms.  As reflected in the number of firearms, firearm parts, and accessories defendant possessed, that decision was not a spur-of-the-moment or the product of an isolated mental episode, but was a decision defendant consistently made over time while functioning well enough to hold down a steady job and pay rent.  (Compare e.g. PSR ¶¶ 71, 87 (noting that from 2019 until shortly before his arrest, defendant was employed and was a "responsible tenant") with id. ¶ 12 (explaining that defendant made numerous online purchases for firearm parts and accessories between January 2020 and July 2021 using the email

address "deathbeforedishonor").)  Moreover, defendant's fixation on Boogaloo and 3 Percenter ideology (id. ¶¶ 12, 15, 18) and his admission that he knew he was not allowed to have firearms because of his mental health issues (id. ¶ 20) suggests that his collection of firearms was willful.  Thus, defendant's mental health condition does not warrant anything below a low-end Guidelines sentence.

**B.   Need for Deterrence and to Promote Respect for the Law and Avoid Unwarranted Sentencing Disparities**

Defendant has no criminal record and has never served a custodial sentence; thus, a low-end Guidelines sentence, followed by three years' supervised release, should hopefully be sufficient to deter defendant from future criminal conduct and to promote respect for the law.  But as described above, defendant's conduct was serious and was a continuing offense drawn out over some period of time, rather than a one-off mistake.  A significant downward variance would send the message that defendant can continue to engage in similar conduct in the future and face only minimal consequences.  Moreover, as Probation pointed out, the low end of the Guidelines -- 24 months' imprisonment -- is the median length of imprisonment for defendants with similar criminal records who are sentenced under the same Guidelines provision (and many of whom engaged in conduct less serious than defendant's, which is not wholly captured by U.S.S.S. § 2K2.1).  (PSR ¶ 113.)  By sentencing defendant within the Guidelines, the Court will minimize sentencing disparities among similarly situated defendants.  See United States v. Treadwell, 593 F.3d 990, 1011 (9th Cir. 2010) ("Because the Guidelines range was correctly calculated, the district court was entitled to rely on the Guidelines range in determining that there was no 'unwarranted

disparity' . . .""); Gall v. United States, 552 U.S. 38, 54 (2007) ("[A]voidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges.").

## V. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence defendant to 24 months' imprisonment, three years' supervised release on the terms and conditions specified by Probation, to include suspicion-less search conditions, mandatory mental health treatment, and computer monitoring, a $100 special assessment, and no fine.